IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRANDTON WOODWARD | : | CIVIL ACTION |
| | : | |
| v. | : | No. 24-1367 |
| | : | |
| PEARL NUDY, et al. | : | |

**MEMORANDUM**

**Judge Juan R. Sánchez**                                                                       **February 28, 2025**

Plaintiff Brandton Woodward ("Woodward") brings this action alleging conversion, fraud, conspiracy, and other related claims regarding property disputes that arose following the death of his father, Joseph C. Woodward III ("Decedent"). Defendants Arlene Walsh, Judith Pandozzi, and Diane Saeli—three of the four defendants in this case—have moved to dismiss Woodward's claims against them on various grounds including statute of limitations, jurisdictional issues, and the failure to join an indispensable party. Because Woodward's claims are time-barred—or relief is otherwise unavailable—the motions to dismiss—one filed by Walsh and the other filed jointly by Pandozzi and Saeli—will be granted.

**BACKGROUND**

On July 3, 2020, Plaintiff Brandton Woodward's father, Joseph C. Woodward III, passed away. ECF No. 7 ¶ 8. At the time of his death, Decedent lived at 26 Waterloo Avenue in Berwyn, Pennsylvania. *Id.* ¶ 18. Plaintiff Brandton Woodward alleges he was and continues to be the sole beneficiary to Decedent's estate. *Id.* ¶ 12. Woodward alleges that despite Defendants' knowledge that he was the sole beneficiary, Defendants conspired to convert his personal property and defraud him.[1] While the Amended Complaint is sprawling and at times hard to follow, the Court understands the relevant chronology to be as follows:

---

[1] The defendants in this case are Arlene Walsh, Woodward's paternal aunt and Decedent's sister; Pearl Nudy, who grew up across the street from the Woodwards and was childhood friends

On July 3, 2020, Joseph C. Woodward III passed away. *Id.* ¶ 8. In early July, Defendants Nudy, Saeli, and Pandozzi "assumed exclusive use and control of [26 Waterloo Avenue] and began to clean out the property with the intent to surreptitiously sell anything that could generate a dollar." *Id.* ¶ 47. Defendants sold valuable assets and discarded the rest such as "family treasures that would only have an intrinsic valuation to family members." *Id.* ¶ 49. Woodward alleges his personal property was subject to that conversion.[2]

On July 6, 2020, Nudy appeared at the home of Decedent's next-door neighbor, Jack Lane, falsely claiming she had been appointed by a court to oversee Decedent's home. *Id.* ¶¶ 42-43. Nudy asked Lane to notify the police if he saw anyone on the property, specifying that Woodward was not permitted on the premises because he had "shot up the place previously and was wanted by the police," which Woodward claims is not true. *Id.* ¶ 43.

Sometime thereafter, Pandozzi contacted Woodward's mother and the Decedent's ex-wife, Velma Sassaman, falsely claiming to be Decedent's sister. *Id.* ¶¶ 8, 60. Pandozzi informed Sassaman that Decedent had died but asked Sassaman not to share the news with Woodward because he and the Decedent did not get along. *Id.* ¶¶ 60-61. Sassaman refused, and immediately contacted Woodward and relayed the "strange conversation and request from a sister she never met nor believed." *Id.* ¶ 63. After learning his father had died, Woodward contacted Michelle Oreski, the mother of his daughter, and asked Oreski to contact Pandozzi to learn more about

---

with Walsh; and Judith Pandozzi and Diane Saeli, whose relationship to Woodward, Decedent, and the other defendants is unspecified. *Id.* ¶¶ 8-15.

[2] The personal property at issue consists of gifts and family heirlooms Woodward received over the course of his life including Revolutionary War muskets, railroad pocket watches, Civil War derringers, the Decedent's Vietnam War sidearm, the family silver set for 18, pearls, and a painting titled, "Horse," which was made by Woodward's grandfather. *Id.* ¶¶ 25-27. Woodward values these items at $63,050, in addition to their priceless sentimental value. *Id.*

funeral arrangements and to request that "Horse," the painting made by his grandfather, be returned to him. *Id.* ¶¶ 64-65.

On July 25, 2020, Decedent's memorial service was held. *Id.* ¶ 70. Woodward did not attend as he was "battling COVID, on probation, and under quarantine in Maine" at the time. *Id.* ¶ 64. At the service, Oreski informed Nudy, Saeli, and Pandozzi that she was in contact with Woodward and had his contact information, although defendants did not request the information. *Id.* ¶ 71. Oreski also specifically requested information about "Horse" from Pandozzi. *Id.* The three defendants presented Woodward's daughter with various gifts his daughter had given to Decedent, which Woodward understood to mean the three defendants were "in complete control of the family home." *Id.*

By July 28, 2020, Nudy, Saeli, and Pandozzi had converted the most valuable items from the home and had stored other items for an upcoming "cash and carry sale." *Id.* ¶¶ 50, 74. The remaining items—such as various family heirlooms—were left on the garage floor until May 2021, when Woodward gained possession of the home. *Id.* ¶ 50.

On July 29, 2020, Pandozzi and Saeli, representing themselves to be Decedent's legal sisters, executed sworn renunciations of Decedent's estate at the Chester County Deputy Register of Wills in favor of Nudy. *Id.* ¶ 77. The renunciations were false, as Arlene Walsh was Decedent's only sister. *Id.* ¶ 10.

On August 28, 2020, Nudy filed a petition to administer Decedent's estate, stating Decedent died intestate and his only son, Woodward, could not be located. *Id.* ¶¶ 80, 84. Nudy further stated Saeli and Pandozzi thought Woodward might be dead since he had had no contact with his father in at least 15 years. *Id.* ¶ 84. On August 31, 2020, the Chester County Register of Wills issued a Petition for Citation to Show Cause Why Petitioner [Pearl Nudy] Should not be

Appointed Administrator, which was not attempted to be served upon Woodward. *Id.* ¶¶ 87-88. On September 23, 2020, Nudy was appointed administrator of the estate. *Id.* ¶¶ 89-90.

In November 2020, Nudy tried to sell the home at 26 Waterloo Avenue. *Id.* ¶ 92. When her efforts were unsuccessful, she began to rent the premises in December 2020, directing tenants to pay her directly. *Id.* ¶¶ 93-95.

In early 2021, John Lane, Esq.—Decedent's next-door neighbor—began to grow suspicious of his interactions with Nudy and searched online for Woodward. *Id.* ¶¶ 97-98. Readily finding Woodward's information, Lane contacted Woodward and informed him of "what was occurring next door." *Id.* ¶ 98. Woodward immediately retained Lane as his lawyer. *Id.* ¶ 99.

In May 2021, Woodward gained possession of 26 Waterloo Avenue. *Id.* ¶ 50. On May 24, 2021, Woodward filed a petition to "rescind the fraudulent Letters of Administration" and remove Nudy as administrator. *Id.* ¶ 100. Nudy then sought the assistance of Walsh, Decedent's only sister, who Nudy nominated to serve as administratrix "in a desperate response to continue the concealment of [the] conspiracy to convert." *Id.* ¶ 101. On July 30, 2021, Walsh was appointed as administrator. *Id.* ¶ 106.

Woodward appealed the order appointing Walsh, and on September 8, 2022, Woodward was appointed administrator. *Id.* ¶ 108. Woodward also twice petitioned the Orphan's Court to compel Nudy to file an accounting to better determine which assets were claimed to be part of the estate and which were Woodward's personal property. *Id.* ¶ 110. Neither petition was addressed by the Court, and Nudy never filed an accounting. *Id.* ¶¶ 110-11. As of June 12, 2024, Nudy had continued to refuse to turn over estate records and property to Woodward, despite having been directed to do so. *Id.* ¶ 109. On March 21, 2023, Nudy provided Woodward an informal

accounting—"fraught with doctored records and inconsistent facts"—that confirmed his personal property was not included in the estate. *Id.* ¶¶ 113-15.

As of June 12, 2024, Nudy was in possession of certain guns and had communicated to Woodward that he could have the guns if he paid Walsh for her share of the gun ownership, as the guns previously belonged to her and Decedent's father. *Id.* ¶¶ 118. As of that date, Pandozzi and Saeli also remained in possession of firearms and 50 boxes worth of the Decedent's possessions, which according to Nudy, they agreed Woodward could have. *Id.*

On April 2, 2024, Woodward brought this suit against Nudy, Pandozzi, Saeli, and Walsh for conversion, fraud, conspiracy to commit conversion and fraud, aiding and abetting fraud, and concert of action. ECF No. 1. Woodward later amended his complaint, revising the facts section and adding a new claim for replevin. *See* ECF No. 7. Walsh has moved to dismiss the claims against her. ECF No. 10. Pandozzi and Saeli, filing jointly and represented by the same attorney, have also moved to dismiss the claims against them. ECF No. 11. Because the motions raise similar arguments and involve the same set of facts, the Court will address both the motions simultaneously.

**LEGAL STANDARD**

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead sufficient facts that, when accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a motion to dismiss, a reviewing court must (1) determine the elements required to plead each claim, (2) identify which allegations are conclusory and may not be accepted as true, and (3) assess whether the remaining, non-conclusory allegations plausibly entitle the plaintiff to

5

relief. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). In doing so, a court must "accept as true all factual allegations in the complaint and view those facts in the light most favorable to the non-moving party." *Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020). The court may also consider "exhibits attached to the complaint," "matters of public record," and documents "integral to or explicitly relied upon in the complaint" at the motion to dismiss stage. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (cleaned up). A defendant may raise a statute of limitations defense in a motion to dismiss "if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Id.* (citation and internal quotation marks omitted). Dismissal is appropriate when the limitations defense is "apparent on the face of the complaint." *Id.*

**DISCUSSION**

Defendants Walsh, Pandozzi, and Saeli have moved to dismiss all counts against them in Woodward's Amended Complaint: conspiracy to commit conversion (Count I), conversion (Count II), conspiracy to commit fraud (Count III), aiding and abetting fraud (Counts IV, V), concert of action (Count VI), replevin (Count VII), and punitive damages (Count VIII). Because these claims either are time-barred, depend on underlying claims that are time-barred, or otherwise fail to state a claim, the motions to dismiss will be granted in their entirety.

**I.    Conspiracy to commit conversion and conversion (Counts I and II)**

Defendants move to dismiss Woodward's claims for conversion and conspiracy to commit conversion, arguing the conversion claim is barred by the statute of limitations and the conspiracy claim is derivative of the conversion claim and cannot proceed alone. Because Woodward's claim for conversion was filed after the statute of limitations ran, and the conspiracy claim cannot proceed independently, the Court will dismiss Counts I and II as to the moving defendants.

6

Under Pennsylvania law, conversion is the "deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Naidu v. PNC Bank, Nat'l Ass'n*, 729 F. Supp. 3d 467, 474 (E.D. Pa. 2024) (quoting *Universal Premium Acceptance Corp. v. York Bank & Tr. Co.*, 69 F.3d 695, 704 (3d Cir. 1995). Conversion occurs when a person "1) acquir[es] possession of property with the intent to assert a right to it adverse to the owner; 2) transfer[s] the property and therefore depriv[es] the owner of control; 3) unreasonably withhold[s] possession of the property from the one who has the right to it; [or] 4) misus[es] or seriously damage[es] the property in defiance of the owner's rights." *Fenton v. Balick*, 821 F. Supp. 2d 755, 760 (E.D. Pa. 2011) (citing *Norriton E. Realty Corp. v. Central–Penn. Nat'l Bank*, 254 A.2d 637, 638 (Pa. 1969))

Conversion claims are subject to a two-year statute of limitations. *See* 42 Pa. Cons. Stat. § 5524(3); *Shonberger v. Oswell*, 530 A.2d 112, 114 (Pa. Super. Ct. 1987) ("Conversion is an action at law and is, therefore, subject to the two-year statute of limitations."). The applicable limitations period begins to run "as soon as the right to institute and maintain a suit arises," *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.***,** 503 Pa. 80, 468 A.2d 468, 471 (1983) (citations omitted), or put differently, "when an injury is inflicted." *Nicolaou v. Martin*, 195 A.3d 880, 892 (Pa. 2018); s*ee also Exeter Twp. v. Gardecki*, No. 18-01723, 2018 WL 6616930, at *2 (E.D. Pa. Dec. 17, 2018) ("The statute of limitations for tort actions in Pennsylvania generally begins at the time of the last step necessary to complete the tort."). "Pennsylvania favors strict application of statutes of limitations." *Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011).

Woodward's conversion claim is barred by the statute of limitations. Through this claim, Woodward seeks to challenge the conversion of his personal property by the Defendants. However, the claim is time-barred because the Amended Complaint makes clear that Woodward has been

7

aware since 2021 that Defendants were in control of his father's home and the belongings therein. Specifically, Woodward alleges that in early 2021, John Lane, Decedent's next-door neighbor and Woodward's future lawyer, informed Woodward of "what was occurring [at 26 Waterloo Avenue]" after growing suspicious of Nudy. ECF No. 7 ¶ 98. Then in May 2021, Woodward visited his father's home and learned that the contents of the premises—including his personal possessions—had been removed. *Id.* ¶ 50. In June 2021, Woodward filed a case in state court against Defendants Nudy, Pandozzi, and Saeli alleging the Defendants "conspired against [him] to deprive [him] of his intestate right to take his late father's Estate" and that Nudy "converted, or otherwise disposed of *every single item* in Plaintiff's father's 26 Waterloo Ave. home." ECF No. 11-5 ¶¶ 18, 33 (emphasis added). By early 2021—and at latest, by June 2021—Woodward knew Defendants had converted the items in his father's home, whether by taking his items as their own, gifting or selling them to others, or improperly including them as part of the Estate. Indeed, in his response to the motions to dismiss, Woodward admits he knew of the conversion even earlier, stating he was "aware as early as July 2020, that '[Nudy, Pandozzi, and Saeli] were in wrongful possession of his own property (and that of the Estate).'" ECF No. 12 at 17. Even a generous calculation—starting at the date the state court lawsuit was filed—indicates the statute of limitations on Woodward's conversion claim expired in June 2023, well before this case was filed on April 2, 2024.[3]

Additionally, because Woodward's conversion claim is time-barred, his claim for conspiracy to commit conversion may not proceed because civil conspiracy is "not independently

---

[3] Woodward also alleges as of June 2024, Nudy remained in possession of certain guns and a gun safe, for which Nudy demanded payment, and that Saeli and Pandozzi agreed Woodward could have the guns and 50 boxes of his father's belongings. ECF No. 7 ¶ 140. These allegations do not extend the statute of limitations because they are not new acts of conversion, but pertain to the same original acts of conversion, of which Woodward was aware several years ago.

8

actionable," but must be tied to an underlying tort, in this case conversion. *Boyanowski v. Cap. Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000). "[A plaintiff] cannot sue a group of defendants for conspiring to engage in conduct that would not be actionable against an individual defendant." *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999); *see also Curbison v. U.S. Gov't of New Jersey*, 242 F. App'x 806, 810 (3d Cir. 2007) (dismissing derivative conspiracy claim where underlying tort claim was dismissed as time-barred); *Weaver v. Brozell*, No. 2:23-CV-2116, 2024 WL 4476496, at *6 (W.D. Pa. Oct. 11, 2024) (same). Counts I and II, alleging conspiracy to commit conversion and conversion, will therefore be dismissed.

## II.   Conspiracy to Commit Fraud (Count III)

Next, Defendants seeks to dismiss Woodward's claim for conspiracy to commit fraud (Count III), in which he alleges all Defendants "conspired and agreed to intentionally perpetrate fraud in raising the estate for the purpose of depriving Plaintiff Woodward [of] his right to discover the extent of the conversion of his personal assets by denying him any access to information or any assets claimed to be owned by the Estate to which he is the sole heir." ECF No. 7 ¶ 143. Defendants argue this claim must also be dismissed on statute of limitations grounds. The Court agrees.

Under Pennsylvania law, claims for fraud carry a two-year statute of limitations. 42 Pa. Con. Stat. § 5524(7); *see also Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 419 (E.D. Pa. 2014) (a claim for civil conspiracy has the same statute of limitations as the underlying tort). Woodward's claim for conspiracy to commit fraud centers on the fraudulent raising of his father's estate. The Amended Complaint makes clear Woodward knew of the potentially fraudulent activity as to his father's estate by no later than May 2021, when he "filed a Petition to Rescind the fraudulent Letters of Administration." ECF No. 7 ¶ 100. As a result, the two-year statute of limitations

applicable to this claim ran by May 2023, if not earlier. Woodward claims the fraudulent activity made it such that he was "unable to determine the extent of the conversion of his property and the Estate's property until March 23, 2023" when Nudy provided him with an informal accounting. *Id.* ¶ 145. But as previously discussed, there is no doubt that by 2021, Woodward knew his property had been converted even if he lacked detailed information about how exactly Defendants did so. The additional accounting provided by Woodward does not change this analysis. Accordingly, Count III will be dismissed as time-barred.[4]

**III.   Concert of Action (Count VI)**

As to Woodward's claim for concert of action (Count VI), this theory permits a plaintiff to establish liability for "harm resulting to a third person from the tortious conduct of another." Restatement (Second) of Torts § 876 (1979). The statute of limitations for concerted action is "the same as the substantive cause of action that forms the basis of the concerted action." *Pendergrass v. Pendergrass*, No. 18-478, 2019 WL 9100189, at *3 (E.D. Pa. Jan. 31, 2019). Here, conversion and fraud are the substantive causes of action for the concert of action claim. *See* ECF No. 7 ¶ 159 ("Each of these individual tortious acts were done in concert with tortious acts of their fellow tortfeasors . . . ."). As previously discussed, the two-year statute of limitations for Woodward's conversion and fraud claims has already run. Moreover, concert of action claims—like conspiracy claims—cannot survive without an underlying tort. *See Miller v. Cnty. of Ctr.*, 702 F. App'x 69, 74 (3d Cir. 2017). For these reasons, the concert of action claim will also be dismissed.

**IV.   Replevin (Count VII)**

---

[4] The Amended Complaint also included claims for aiding and abetting fraud against Walsh (Count IV) and against Pandozzi and Saeli (Count V), but Woodward has requested those claims be withdrawn. ECF No. 12 at 15. Counts IV and V will therefore be dismissed as withdrawn.

Lastly, the Court turns to Woodward's claim for replevin (Count VII), through which he seeks to "recover possession of personal property in possession" of Defendants. ECF No. 7 ¶ 164. Because the replevin claim is inapplicable as to Walsh and time-barred as to Saeli and Pandozzi, this claim will also be dismissed.

"Replevin is an action to regain possession of property." *Bartlett v. Demich*, 307 A.3d 736, 741 (Pa. Super. Ct. 2023). To successfully recover property in a replevin action, "it is incumbent on the plaintiff to show not only that he has title, but that he has also the right of immediate possession." *Int'l Electrs. Co. v. N.S.T. Metal Prods. Co.*, 88 A.2d 40, 42 (Pa. 1952). A plaintiff must establish an exclusive right to the property, meaning a right that excludes the defendant. *Bartlett v. Demich*, 307 A.3d 736, 741 (Pa. Super. Ct. 2023). An action of replevin "cannot be maintained against one not in the actual or constructive possession of the property sought to be recovered, so that the defendant, if judgment be rendered against him, may make delivery thereof to the plaintiff. That proposition is so plain as to require little discussion." *Lamb v. CVS Pharmacy LLC*, 704 F. Supp. 3d 606, 612 (E.D. Pa. 2023) (quoting *Winner v. Messinger*, 69 A.3d 172, 174 (Pa. Super. Ct. 1949)). There is a two-year statute of limitations for replevin. 42 Pa. Cons. Stat. § 5524(3); *Zuk v. E. Pa. Psychiatric Inst. of the Med. Coll. of Pa.*, 103 F.3d 294, 300 (3d Cir.1996).

Walsh argues the replevin claim against her must be dismissed because Woodward "does not plead or otherwise allege [she] has actual or constructive possession of any of his own property whatsoever." ECF No. 10-5. The Court agrees. Woodward does not describe any specific property he seeks to recover from Walsh's possession. The only reference to Walsh pertains to certain guns.[5] ECF No. 7 ¶ 140; *see id.* 118. However, the guns are alleged to be in the possession of

---

[5] When asked about the replevin claim at oral argument, counsel added that Woodward wished to recover "funds" from Walsh, but such relief is unavailable through replevin. *Lamb*, 704 F. Supp. 3d at 612.

Nudy, not Walsh. Because Walsh would be unable to "make delivery" of the guns to Woodward, Woodward cannot maintain a replevin claim against her.[6]

The replevin claims against Pandozzi and Saeli fail because they are time-barred. As previously discussed, Woodward alleges his property was converted in 2020 and that by 2021, if not earlier, he was aware of Pandozzi and Saeli's involvement in that conversion. Any claim for replevin to recover that property would have been appropriate within the following two-years, yet Woodward did not bring this action until April 2024. Accordingly, the claim for replevin as to Pandozzi and Saeli is also dismissed.[7]

**CONCLUSION**

Because Woodward's claims are time-barred, inapplicable, or unable to survive independently, the Court will dismiss all claims against Walsh, Pandozzi, and Saeli.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.

---

[6] While Walsh's lack of possession is sufficient to dismiss the claim, it is worth noting that it also remains unclear whether Woodward has superior title to the guns. Woodward claims he owns them because they are either his own personal property or "by virtue of being the sole legal heir." *Id.* ¶ 167. In other words, Woodward claims the guns may be property of his father's estate. At oral argument, counsel confirmed the administration of that estate is still pending. Additionally, the Amended Complaint also indicates the guns may have belonged to Woodward's grandfather, the Decedent's father, further complicating any ownership claims. *Id.* ¶ 140.

[7] Because Woodward's substantive claims have all been dismissed, his claim for punitive damages (Count VIII) also fails because a claim for punitive damages is not a separate cause of action. *Jefferies v. Ameriquest Mortg. Co.*, 543 F. Supp. 2d 368, 390 (E.D. Pa. 2008) (discussing cases). Where there is no cause of action, there is no independent cause of action for punitive damages. *Id.*